1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL KNAPP, et al.,

Defendants.

Case No. 2:14-cr-00099-APG-PAL

REPORT OF FINDINGS AND RECOMMENDATION

(Mtn to Dismiss – Dkt. #34)

13    This matter is before the court on Defendant Michael Knapp's Motion to Dismiss the

14 Indictment for Outrageous Government Conduct (Dkt. #34) filed July 28, 2014, which was

15 referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C.

16 § 636(b)(1)(B) and LR IB 1-4.   The court has considered the Motion, the government's

17 consolidated Response (Dkt. #39) filed August 19, 2014, and Knapp's Reply (Dkt. #42) filed

18 August 25, 2014.

19                                       **BACKGROUND**

20 **I.      Procedural History.**

21    On March 6, 2014, Knapp was charged in a criminal Complaint (Dkt. #1) with two co-

22 Defendants, Von White and Deondre Williams, with conspiracy to interfere with commerce by

23 robbery in violation of 18 U.S.C. § 1951(b)(3); conspiracy to possess with the intent to distribute

24 controlled substances (cocaine and methamphetamine) in violation of 21 U.S.C. §§ 841(a) and

25 (b)(1)(B)(ii)(II), (b)(1)(A)(viii), and 846; possession of a firearm in furtherance of a drug

26 trafficking crime and a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i); and felon in

27 possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Knapp made an

28 initial appearance on the Complaint on March 3, 2014, was appointed counsel, entered a not

1  guilty plea, and submitted to detention pending trial.  *See* Minutes of Proceedings (Dkt. #4);

2  Order Appointing Counsel (Dkt. #10); Order of Detention (Dkt. #12).

3  On March 18, 2014, a federal grand jury returned an Indictment (Dkt. #16) against Knapp

4  and his co-Defendants, charging Knapp with conspiracy to interfere with commerce by robbery

5  in violation of 18 U.S.C. § 1951(b)(3); conspiracy to possess with the intent to distribute

6  controlled substances (cocaine and methamphetamine) in violation of 21 U.S.C. §§ 841(a) and

7  (b)(1)(B)(ii)(II), (b)(1)(A)(viii), and 846; possession of a firearm in furtherance of a drug

8  trafficking crime and a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i); and felon in

9  possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Knapp was

10  arraigned on the indictment and entered a not guilty plea to the charges on March 27, 2014.  *See*

11  Minutes of Proceedings (Dkt. #21).  Trial is currently scheduled December 1, 2014.  *See* Order to

12  Continue (Dkt. #46).

13  The criminal complaint and Indictment arise out of an ATF investigation of Co

14  Defendant White which resulted in a reverse sting operation that resulted in charges brought

15  against all three of the Defendants.

16  **II.    The Parties' Positions.**

17  **A.    Knapp's Motion to Dismiss (Dkt. #34).**

18  Knapp seeks an order dismissing the Indictment for outrageous government conduct

19  pursuant to the due process clause of the Fifth Amendment to the United States Constitution.

20  Weighing the factors enumerated by the Ninth Circuit's recent opinion in *United States v. Black,*

21  733 F.3d 294, 304 n.7 (9th Cir. 2014), Knapp argues that the Indictment should be dismissed

22  because of the government's "extensive involvement in dreaming up this fanciful scheme,"

23  which involved a large and arbitrary amount of drugs and the illusory need for weapons and

24  associates.

25  First, Knapp contends that the government had no knowledge of Knapp's criminal

26  background and had no individualized suspicion before it initiated its reverse sting operation.

27  The government did not know of Knapp's existence or prior criminal history until the February

28  25, 2014, meeting which was weeks, if not months, after the government had already started

their operation.   Knapp was arrested March 5, 2014, only eight days after the government became aware of his existence.   Knapp acknowledges that the Ninth Circuit has held that individualized suspicion of a defendant's criminal conduct is not required before conducting an undercover investigation.   However, in *Black*, the Ninth Circuit held that it was a relevant consideration.   Although the government ran a criminal records check of Knapp after the February 24, 2014, meeting, it revealed only that Knapp had a history of unrelated convictions for domestic battery and carrying a concealed firearm.   Knapp's criminal history did not indicate that he had been previously involved in or suspected of a robbery.

Second, Knapp contends that the government created the crimes charged in the Indictment.   The undercover agent invented the entire scheme, including the existence of a stash house, the plan to rob the stash house, the people who were purportedly guarding the drugs in the stash house, the undercover agent's drug courier persona, and the means by which the people guarding the stash house would be subdued.   The government also provided Knapp and his co-Defendants with a rental car to use as a getaway vehicle as well as a staging area on the day of the fictional stash house robbery.   Prior to the government's reverse sting operation, Defendants were not involved in any criminal enterprise of stash house robberies.   Thus, the government did not infiltrate an ongoing criminal scheme and instead manufactured the entire crime.

Third, Knapp argues that the government encouraged him to commit the robbery because the undercover officers made certain statements, including asking if Knapp was "down for it," asking if he had "tools" for the job, wanting to "make sure everything goes cool," offering to get the Defendants a rental car, offering to find somebody to pay cash for the drugs, stating the proceeds would be "split down the middle," telling the Defendants to do whatever they have to do, and telling the Defendants the home invasion was a "try out" and if it went well would result in "work down the road."   Knapp acknowledges that the Ninth Circuit has held that mere encouragement is of a lesser concern than pressure or coercion.   However, he cites Justice Stevens' dissenting opinion in *United States v. Armstrong*, 517 U.S. 456, 483 (1996), for the proposition that targeting poor and minority citizens without individualized suspicion presents a grave danger of arbitrary enforcement of the laws that both the due process and equal protection

clauses of the Constitution are designed to prevent.  Knapp also argues that the government's inducement of a large payout to those without economic means may cause an otherwise law abiding person living in poverty to make false or exaggerated claims about his willingness to participate in a criminal venture.

Fourth, Knapp contends that the government participated in and planned the crime.  The undercover agent planned the February 25, 2014, meeting and a follow-up meeting on March 2, 2014.  Knapp asserts he "simply followed the [undercover agent's] lead" and met the agent wherever the agent asked.  The government provided all the elements of the crimes charged in the Indictment: the scheme and its fictitious components, including a getaway car.  The undercover agent also proposed to be inside the stash house at the time of the robbery to alleviate logistical and safety concerns and encouraged Knapp and his co-Defendants to acquire weapons to carry out the robbery.  Knapp relies on Judge Wright's recent decision in *United States v. Hudson*, 3 F. Supp. 3d 722 (C.D. Cal. 2014), to support his arguments that the government's conduct in this case offends the due process clause of the United States Constitution.

Alternatively, Knapp requests the court dismiss the Indictment using its supervisory powers.  In this reverse sting operation, Knapp argues, there are no real drugs, and the government does not make the streets any safer.  But for the government, there would have been no illegal conduct.  There is no indication that Knapp was engaging in any activity that, if stopped, would have assisted society as a whole.

**B.**     **The Government's Response (Dkt. #39).**

The government argues that dismissal for outrageous government conduct may be invoked only when the government's conduct is so grossly shocking and outrageous to violate the universal sense of justice.  This is an extremely high standard.  In *Black,* the Ninth Circuit recognized that there are only two reported appellate court decisions that have reversed convictions for outrageous government conduct.  In *Black*, the Ninth Circuit stressed that each case must be judged on its own particular facts.  Applying the *Black* factors, the government argues Knapp cannot meet the extremely high standard for dismissal of the Indictment for

/ / /

outrageous government conduct.  The government contends the court must apply the *Black* factors to the investigation as a whole and not to each Defendant individually.

First, the government had individualized suspicion of co-Defendant White's wrongdoing and had purchased numerous firearms from White, many of which were stolen.  The government was also aware of White's criminal history, and White had discussed his prior crimes with the confidential informant ("CI") and undercover agent.  The government became aware of Knapp and co-Defendant Williams when White brought them to the February 25, 2014, meeting.  After learning their identities, the Bureau of Alcohol, Tobacco and Firearms ("ATF") learned of their criminal histories.  ATF also learned that Williams was with White when White was shot multiple times on June 21, 2013, by two males who accused White of planning to rob them.

Second, the government concedes that ATF "set the bait" in this case, invented the basic scenario, and decided what amount of drugs was involved.  However, all three Defendants responded without further inducement by the government, and White, not the ATF, recruited Williams and Knapp.  In addition, all three Defendants boasted about their past criminal exploits.  Although the government is entitled to rely on the Defendants' representations of their past criminal conduct in this case, ATF agents also obtained the Defendants' criminal histories which verified their prior violent felony convictions.

Third, the government did not coerce or pressure the Defendants to commit the robbery.  Although it proposed the robbery, Defendants "eagerly jumped at the opportunity."  Fourth, the entire reverse sting operation consisted of four meetings—one with White alone and three with all three Defendants.  Once the scheme was initiated, the government played a minimal role in the crime.  It did not provide weapons or difficult-to-obtain materials.

In *Black*, the Ninth Circuit recognized that stash house robberies are largely unreported crimes that propose a great risk of violence in residential communities.  The nature of stash house robberies warrants employing this sort of investigation tactic, and the ATF did not randomly recruit people in lower income neighborhoods to commit the fictional robbery.  White was already selling guns to the undercover agent, and all three Defendants had convictions for violent felonies and told the government agent "early and often" that they had committed similar

1    crimes.  Furthermore, the government did not recruit Knapp and Williams; White did.  Finally,

2    all of the undercover meetings were recorded to prove what was actually said and done.

3         With respect to Knapp's alternative request that the court dismiss the Indictment under its

4    supervisory powers, the government argues that none of the factors recognized by the Ninth

5    Circuit exist in this case.  A court may only use its supervisory powers to dismiss an indictment

6    (1) to remedy a Constitutional or statutory violation, (2) to protect judicial integrity by ensuring

7    that a conviction rests on appropriate considerations before a jury, or (3) to deter future illegal

8    conduct.  Knapp has not established any evidence of illegal or improper government conduct.

9         **C.    Knapp's Reply (Dkt. #42).**

10        Knapp replies that the government learned of Knapp only after February 25, 2014, and

11   even after reviewing his criminal history, there was nothing to indicate he was a known robber.

12   His only convictions were for carrying a concealed firearm/street gang and corporal injury to a

13   spouse.  None of his convictions indicated he was involved in any theft, conversion, larceny,

14   robbery, burglary, or other similar crime.  White was also not actively suspected of committing

15   robberies, and the reverse sting operation was not relevant to the conduct the government was

16   initially targeting—namely, the illegal sale of weapons.  In addition, the court has no information

17   about the inception of the investigation because the government has not described how the CI

18   knew White.

19        The government did more than merely "set the bait" in this case.  It controlled who

20   Knapp was going to meet, what Knapp was going to get, when he would do it, where the pre-

21   arrest meetings took place, where the purported drugs were located, and how Knapp and others

22   were going to rob the stash house.  Knapp contends that he did not respond "without further

23   inducement" by the government or "eagerly jump" at the opportunity to rob the fictitious stash

24   house.  Any statements he made at the February 25, 2014, meeting were in response to direct

25   questions and communication with the undercover agent, and Knapp said very little during the

26   March 2, and March 5, 2014, meetings.

27        Knapp argues the government did more than merely encourage the Defendants to rob the

28   fictitious stash house.  The undercover agent continuously checked in with the Defendants,

challenged them to accept the task, described how the robbery would be completed, set up all of the meetings, and encouraged the Defendants to carry out the robbery by promising them a split of the proceeds and future work if the robbery went well.  This encouragement must be viewed in light of the economic status of Knapp and his co-Defendants.  In this case, the government has not shown it was equally targeting suspects in affluent neighborhoods.

The government played more than a minimal role in the robbery because it created the robbery scheme from the start, carried out the planning with meetings, and eventually arrested Knapp on March 5, 2014.  The government was not simply an observer, but was a partner in the criminal activity when the two undercover agents agreed to split the robbery proceeds with the Defendants.  This was not a complex operation that required the government to provide weapons or difficult to obtain materials, but the government did provide a rental getaway car and provided a staging area the day of the robbery.  It also supplied a fictional buyer for the drug proceeds, and directed how the robbery would occur.  It would have been impossible for the Defendants to carry out the scheme without the government's participation because the Defendants did not know the location of the stash house.

Finally, Knapp disputes the government's suggestion that there was a "great risk of violence" to any community caused by this fictional stash house robbery.  Creation of a crime merely to press criminal charges is outrageous government conduct.  Knapp contends the government "doubled down" on an undercover gun sale case, did not consider alternatives, take drugs off the streets, or stop any stash house robbery.  The Indictment should therefore be dismissed.

**<u>DISCUSSION</u>**

The arguments raised in the Motion, Response, and Reply are all derived from facts gleaned from the discovery produced in this case, including audio and video recorded meetings between one or more of the Defendants and undercover officers and/or the CI.  Both sides ask the court to draw different conclusions from the same information but do not fundamentally dispute what occurred in terms of the course of the investigation or the events leading up to Knapp's arrest.

## I.      Statement of Uncontested Facts

In October 2013, the ATF opened an investigation into co-Defendant Von White, a convicted felon.  An ATF CI told his ATF handler that White had firearms to sell.  White sold the CI eleven firearms in a series of controlled buys on October 24, 2013, November 5, 2013, December 5, 2013, December 13, 2013, January 10, 2014, and January 28, 2014, all of which were surveilled and monitored by ATF agents.  During all of these transactions, the CI was provided with video and audio equipment that recorded the conversations.  These recordings have been transcribed and provided to defense counsel in discovery.

On November 5, 2013, the CI conducted a controlled purchase of a stolen handgun from White.  During the sale, White made statements to the effect that he knew young men who were "hungry," who would "kill a . . . for, like, two grand."

On December 13, 2013, the CI bought two more handguns from White, one of which was stolen.  The government claims, and Knapp does not dispute, that on January 6, 2014, the CI told ATF agents that he had an unrecorded conversation with White on January 2, 2014.  White was with another individual who had multiple felony convictions in Nevada, including robbery, second degree murder, and trafficking a controlled substance.  The CI told ATF that White had acted as a driver and lookout during a recent armed home invasion of a local methamphetamine dealer.  The CI reported to ATF that White claimed the victim of the home invasion robbery revealed where his drug money was located after the robbers threatened to shoot the victim's dog.  The CI reported that White had a large stack of currency and that White said it was his share of the home invasion robbery.  The CI also reported that the second man with White told the CI that he had "rah rahs" available to handle any "business" the CI may have.

On January 10, 2014, White sold the CI and undercover ATF Task Force Officer Detective Larios three guns, including a stolen handgun, which ATF investigators later determined belonged to the victim of a 2008 homicide in Phoenix, Arizona.  The ATF did not launch its reverse sting operation until after Larios accompanied the CI to this January 10, 2014, meeting.

/ / /

- 8 -

A.    **January 28, 2014, Meeting.**

On January 28, 2014, the CI and Larios made an additional controlled purchase of a handgun and 12 gauge shotgun from White.  During this purchase, Larios told White that he had some "heavy lifting" for White, who responded he was in the "construction business."  Larios told White that he needed the "NFL," not "junior varsity."  White responded that "my dudes are Hall of Fame."  An agreement was made to meet in the near future to discuss the "heavy lifting."

B.    **February 12, 2014, Meeting.**

On February 12, 2014, White met with the CI and Larios at a Las Vegas restaurant. Larios told White that he worked as a courier, delivering drugs he would pick up from the fictional stash house.  *See* Transcript of February 12, 2014 meeting attached as Exhibit 1 to the government's response at p. 10.  Larios told White the house was guarded by two "Mexican dudes," one of whom was armed with a "strap" [gun] in his waistband.  *Id.* at 10, 13.  Larios said there were up to four kilos of cocaine and eight to ten pounds of methamphetamine, and suggested a home invasion robbery.  Larios asked White to promise him, "if you ain't down to do this shit, bro, no harm no foul.  Fucking forget we ever had this fucking conversation and  . . . ."  *Id.* at 11.  White responded that before they went into more detail, he was "with it all the way" but asked Larios if he wanted the two individuals guarding the stash house "executed or do they live?  I don't give a fuck."  *Id*.  Larios asked White if he was "sure you're down for this shit."  *Id.*  White responded "yeah.  That shit . . . that's . . . what I do."  *Id*. at 13.

Larios and White continued to discuss the details of a potential stash house robbery and Larios eventually asked White if he had "done this shit before."  *Id*. at 18.  White responded, "you can Google me.  Google my criminal record.  And it show you nothing' but kidnap, robbery.  Robbery, robbery, robbery, robbery, robbery.  That's what I do.  It's how I was raised." *Id.*  Larios specifically asked whether White had done a stash house robbery before, and White responded that he preferred to do them to "stay out of the fed's way" and "'cause what they [the victims] gonna do, call the cops, you know."  *Id*. at 19.  After further conversation, White professed to be a "drug dealing robber."  *Id*. at 20.  Larios told White that if he could not sell the drug proceeds, Larios had "his own people."  *Id*.  Larios said he could not do the robbery with

the CI because the "Mexican dudes" had seen the CI with Larios.  *Id*.  White responded he had two people who could help.  *Id*. at 21.  White also said he had "two little brothers" who were in their "prime," who liked to do home invasion robberies, and had "the tools."  *Id*. at 21-29. Larios insisted on meeting them.  *Id*. at 21.

White also claimed that he had been shot seven times in front of his apartment by two men.  *Id*. at 31-33.  After the February 12, 2014, meeting, ATF agents investigated and learned that on June 21, 2013, White had been shot multiple times outside of his apartment.  The police report of the incident indicates that the men who shot White believed White was discussing robbing the men.  *See* Police Report, attached as Exhibit 2 to the government's Response.

**C.      February 25, 2014, Meeting.**

Larios set up a meeting with White on February 25, 2014, at the South Point Hotel & Casino.  White brought co-Defendants Williams and Knapp to the meeting.  The transcript of the recorded conversation indicates Larios asked Williams and Knapp if White had told them why Larios wanted to meet with them.  *See* Transcript of February 25, 2014, Meeting, attached as Exhibit 3 to government's Response at 4.  Larios explained that he did deliveries and needed the Defendants to rob a stash house.  *Id*.  Williams responded, "You picked the right people" and stated that the biggest question he had was "the point of entry.  How will we get in?"  *Id*.

Larios told the Defendants that there would be three to four kilos of cocaine and eight to ten pounds of methamphetamine in the stash house, and the house was guarded by two Mexican dudes, one of whom has a "strap" tucked in the waistband of his pants.  *Id*. at 5-6.  White said he had discussed the plan to rob the stash house with Knapp and Williams in the car on the way to the South Point, and they had decided they were "gonna do the zip tie route.  Woo, woo, woo . . . zip tie your hands, zip everybody up, a couple stomach shots, maybe give you some body shots." *Id*. at 6-7.  Knapp stated, "It's all acting, man" and agreed they would "just zip tie up . . . basic tie up, like my boy said . . . . Couple body shots."  *Id*. at 7, 9.  When Larios asked Knapp whether he was "down for this," Knapp responded, "I'm good.  I'm down."  *Id*. at 11, 12.  When Larios told Knapp that half of the drug proceeds were his, Knapp responded, "I know.  I know."  *Id*. at 12.  Larios stated he did not think there would be cash at the fictional stash house, but if there

were, the proceeds would be "split in half."  *Id*. at 12.  Knapp agreed to "split the cash three ways

even."  *Id*. at 13.

Larios asked whether Knapp had done a stash house robbery before, and Knapp

responded that "I've been  . . . I mean I've been heading . . . I did shit plenty of times, but at the

same time, it's just like you gotta, you know, it's like I said you have to play your part."  *Id*.

Later, Knapp said, "You know . . . you know I've been doing this shit for, or I did this this plenty

of times."  *Id*. at 18.  He told Larios and White that "you gotta plan before you move . . . and

that's why I'm glad I met you before."  *Id*. at 19.  The Defendants then discussed their plan for

robbing the stash house.  Their initial plan was that White, Knapp, and Williams would force

their way into the home as Larios was leaving.  *Id*. at 27-30.  Knapp stated, "Five . . . five or ten

minutes [after Larios is inside] we'll be ready."  *Id*. at 30.  Knapp told Larios, "This . . . this like

a job to me.  I was, like, ok.  I already got my mind set."  *Id*. at 36.  Larios asked if the

Defendants could sell their half of the drugs, and Knapp responded he "already got people for

that."  *Id.* at 36-37.

ATF conducted a records check after meeting Knapp and Williams and learned that

Williams had a 2008 Nevada felony conviction for burglary and felon in possession of a firearm.

Knapp's record showed a 2007 California conviction for participating in a criminal street

gang/carrying a concealed firearm, and a 2010 conviction for inflicting corporal injury on a

spouse.

**D.      March 2, 2014, Meeting.**

On March 2, 2014, Knapp met with Williams, White, Larios, and undercover ATF

Special Agent John Carr at the South Point Casino in Las Vegas, Nevada.  The first part of the

meeting occurred on the casino floor.  Knapp's motion indicates that White, Williams and Knapp

talked with Larios for approximately thirty-five minutes, discussing the planned stash house

robbery for about twenty minutes.  After this initial discussion, everyone went to a hotel room

rigged with undercover cameras to talk with Larios' "big homie," Special Agent Carr.  Carr had

everyone sit down and stated that he had come from Los Angeles to Las Vegas "to do some

work" and wanted "to make sure I feel good about this and number one I want to make sure

nothing happens to [Larios]." *See* Transcript of March 2, 2014, Meeting, attached as Exhibit 4 to government's Response at 9. Carr also stated that he was concerned about the police, someone talking, and having the robbery "come back on us." *Id*. White responded that he had been around since twelve, and had "prison time up under me," but no "dirty jacket." *Id*. White also stated that he was cautious by nature and that was why he had "made it this far." *Id*. at 10. Carr stated that he was there to "make sure . . . everything goes cool." *Id*.

Carr stated that the proceeds of the robbery would be divided equally, and Knapp responded "everything equal." *Id*. White discussed what he had "planned out in [his] brain" about how to do the robbery and have his "two brothers" get the drop on the dealer as soon as the dealer came to the door. *Id*. at 11. Carr offered to get a rental car the Defendants could use, stating he "got this female that works at a rental car company that lets us take cars off the lot with no papers . . . . I can get you guys one just so that you don't got to drive your own fucking ride." *Id*. at 14. Knapp responded, "That's what I'm talking about. We need one." *Id*. White assured Carr, "This one gonna . . . gonna go perfect. Keep me in mind for the future." *Id*. at 15. Carr responded that if everything "works out clean, then everything is good," he "definitely . . . got some work down the road." *Id*. at 16.

Williams stated that he had been thinking about the plan for a couple of days and was "kinda low key losing sleep over it." *Id*. at 17. Williams said that he liked everything to "be right" and was concerned that "the other dude doesn't have something in the room waiting, you know." *Id*. Williams told Carr that Larios "may have to get hit in the stomach." *Id*. at 18. Carr responded that Larios was "gonna have to play a role." *Id*. Williams and Knapp both stated that the scheme involved acting, playing a role, trying to "win an Oscar" with Knapp saying "it's all staged, you know." *Id*. Carr, Larios, and all three Defendants had an extended discussion about making it look realistic so that Larios was not implicated. For example, Williams stated that the point of entry would be when Larios was getting ready to leave because "it looked more realistic like that." *Id*. at 22.

Carr then asked how the Defendants planned on getting rid of the narcotics they were going to get. *Id*. at 24. Carr said that the bricks were packaged in a certain way and would need

to be "broken down" and repackaged.  *Id.* at 24.  White, Williams, and Knapp discussed their plan to sell their part in Texas because in Las Vegas, as Williams stated, "Some people I don't even know because everything will come back to you."  *Id.* at 24-25.  Carr told the Defendants that the "crystal" was one hundred percent pure and that the cocaine was "top of the line."  *Id.* at 25.

Williams asked if Carr would provide the rental car the day before the planned robbery.  *Id.* at 26-27.  Carr responded that he could not.  *Id.* at 27.  Williams asked if Carr was "sure it's covered?"  Carr responded, "I will have that, guaranteed."  Carr asked what type of vehicle the Defendants wanted, and Williams responded "an SUV with some tints."  *Id.*

The discussion shifted to the cell phone the Defendants would use for the robbery.  Williams told Larios not to save the number in Larios' cell phone, but to write it down in case someone took Larios' phone and tried to look through it.  *Id.* at 28.  Larios stated "that's smart," and Knapp responded, "Like I said, I did this before . . . I did this kind of work."  *Id.* at 29.

Carr told the Defendants he wanted them on time, ready to roll, "tooled up, ready to do your thing."  *Id.* at 30.  Carr and Larios stressed that it was important to be on time so everything would "look like normal," and if Larios was late, the dealers would "close up."  *Id.* at 31.  Williams asked Larios and Carr whether they were sure no one would be watching the house.  *Id.* at 32.  Carr said no one watched the house, explaining that the drug dealers were smart and were connected with a real estate company that told them about vacant houses and different spots for their deals.  *Id.* at 32-33.

Carr guaranteed that he would call the Defendants on Wednesday.  *Id.* at 36-37.  White stated, "So look, man, Tuesday you all gonna be in my crib."  *Id.* at 37.  Williams asked what time Carr was going to get the rental car.  *Id.*  Carr said he would get the car and that everyone should meet a little before seven.  *Id.*  Carr said he felt good about everything.  *Id.* at 38.  Williams responded, "I'm not all smiley today, you know."  *Id.* at 38.  Knapp said, "You got our . . . you got our word for everything."  White said that he was a "longevity-type person" and was born and raised in Carr's hometown of Los Angeles.  The meeting closed with White stating it was nice meeting Carr.  *Id.* at 40.  In response to Larios' comment "We can do this, man," Knapp

said, "Yeah.  We're gonna do this.  We're good."  *Id.*  Williams told Larios, "I'm gonna use me for you.  So if I give you a cool looking body shot, they gonna . . . they gonna be like damn that hurt."  *Id.* at 41.

**E.     March 5, 2014, Meeting and Arrest.**

Larios called White on March 5, 2014.  White, Williams, and Knapp arrived at a gas station in a car driven by a woman to meet Larios.  The female driver followed Larios to a warehouse on East Post Road in Las Vegas where the Defendants were dropped off, and the woman left in the car.  The meeting at the warehouse was recorded.  *See* Transcript of March 5, Meeting, attached as Exhibit 5 to the government's Response.

Carr said his first concern was to ensure nothing happened to Larios.  *Id.* at 2-3.  Williams responded, "Yeah," and White agreed, stating, "That's the first concern."  *Id.* at 3.  White said he had done a lot of talking with Knapp and Williams and had figured out more details of what they were going to do.  *Id.*  The plan was that when Larios said his goodbyes and opened the door, "we coming in."  *Id.*  Williams stated, "We thought about it . . . and we know we always thought actually running in my head about leaving the door unlocked and that might fall back on him."  *Id.* at 4.  White and Williams both said that they wanted the "gunman up close and personal."  *Id.*  Carr responded that that made him feel better, and Knapp asked, "We good?"  *Id.*  Larios then asked what the Defendants would point at him because he did not want to be surprised.  *Id.* at 4-5.

Williams and Knapp said they had zip ties.  Larios stated he just wanted "to make sure you came prepared, dude."  *Id.* at 5.  White said he had a Mossberg, and "they got their little hand tools."  *Id.*  Knapp said he had a hand tool in his pocket.  Williams said, "Mine's going in my pants."  *Id.* at 6.  Carr stated, "Anyone who's got any issues or concerns now is the time to put it out."  *Id.*  Williams responded, "It's show time.  We wouldn't be here."  *Id.*  Knapp responded, "It's show time."  *Id.*  White responded, "I got my ass here."  *Id.*  Williams added, "We're ready."  *Id.*  At this point, the Defendants were arrested.

/ / /

/ / /

- 14 -

1    **II.     Applicable Law & Analysis.**

2         **A.      Request for Evidentiary Hearing.**

3              The caption of the Motion to Dismiss requests an evidentiary hearing.  However, the

4    motion itself does not provide an offer of proof or articulate what Knapp expects an evidentiary

5    hearing would establish if one was conducted.  The Ninth Circuit has held that an evidentiary

6    hearing is necessary where a defendant alleges facts with "sufficient definiteness, clarity, and

7    specificity" to enable the court to conclude that contested issues of fact exist.  *See United States

8    v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (internal citations omitted).  The court need not

9    hold a hearing on a defendant's pretrial motion "merely because a defendant wants one.  Rather,

10   the defendant must demonstrate that a significant disputed factual issue exists such that a hearing

11   is required."  *Id*. (internal citation omitted).  The determination of whether an evidentiary hearing

12   is appropriate rests in the reasoned discretion of the district court.  *See United States v. Santora*,

13   600 F.2d 1317, 1320 (9th Cir.) *amended by* 609 F.2d 433 (9th Cir. 1979).

14              Knapp's Motion to Dismiss is supported by excerpts of four ATF reports and indicated in

15   a footnote that his counsel had requested transcripts of the February 25, 2014, and March 2, 2014

16   meetings.  *See* Motion at 3, n.11.  The motion indicated Knapp would supplement his motions

17   with either the transcripts after a review for accuracy or the underlying audio for the court's

18   consideration if no transcript was available.  The government attached the transcripts of the

19   February 25, 2014, and March 2, 2014 meetings, along with several other exhibits to its

20   response.  Knapp has not challenged the accuracy of the transcripts, disputed their authenticity,

21   or otherwise established a contested issue of fact which warrants an evidentiary hearing.  The

22   court will therefore deny Knapp's request for an evidentiary hearing.

23              Knapp seeks dismissal of the indictment for outrageous government conduct under the

24   due process clause of the Fifth Amendment, or alternatively, under the court's inherent

25   supervisory powers.

26        **B.      Outrageous Government Conduct.**

27              In *United States v. Russell*, 411 U.S. 423, 431-32 (1973), the Supreme Court held that

28   outrageous government conduct occurs when the actions of law enforcement officers or

informants are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  A dismissal of an indictment for outrageous government conduct is rooted in the due process clause of the Fifth Amendment of the Constitution which provides, "no person shall . . . be deprived of life, liberty, or property without due process of law."  U.S. Const. amend. V.

The Ninth Circuit has held that dismissal of an indictment for outrageous government conduct is "limited to extreme cases" in which the defendant can demonstrate that the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice."  *United States v. Stinson,* 647 F.3d 1196, 1209 (9th Cir. 2011).  This is an "extremely high standard."  *United States v. Black,* 733 F.3d 294, 302, (citing *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993)).  There are only two federal appellate court decsions which have reversed convictions for outrageous government conduct.  *Black, Id.* citing *United States v. Twigg*, 588 F.2d 373 (3rd Cir. 1978); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971).

Because there is no bright line rule establishing when law enforcement's conduct goes from acceptable to outrageous, each case must be resolved on its own facts, considering the totality of the circumstances.  *Id.* at 302, 304.  The Ninth Circuit's decisions prior to *Black* provided some guidance about when law enforcement conduct crosses the line between acceptable and outrageous.  In *United States v. Williams,* 547 F.3d 1187, 1199 (9th Cir. 2008), the Ninth Circuit held that it was outrageous for government agents to engineer and direct a criminal enterprise from start to finish (internal quotations omitted).  It is outrageous government conduct to use "excessive physical or mental coercion" to convince an individual to commit a crime.  *United States v. McClelland,* 72 F.3d 717, 721 (9th Cir. 1995).  It is outrageous for the government to generate new crimes "merely for the sake of pressing criminal charges."  *United States v. Emmert*, 829 F.2d 805, 812 (9th Cir. 1987).  It is not outrageous for law enforcement to infiltrate a criminal organization, approach people who are already involved in or contemplating a criminal act, or to provide necessary items to a conspiracy.  *United States v. So,* 755 F.2d 1350,

/ / /

1353 (9th Cir. 1985).  It is also not outrageous for the government to "use artifice and stratagem to ferret out criminal activity."  *United States v. Bogart,* 729 F.2d 1428, 1438.

Both sides rely heavily on the Ninth Circuit's 2013 decision in *United States v.* Black to support their arguments.  In *Black*, the Ninth Circuit found that the reverse sting challenged on appeal fell "within the bounds of law enforcement tactics that have been held reasonable."  733 F.3d at 302.  A "reverse sting" is a term applied when the government initiates the criminal conduct, setting up a fictitious crime, and arresting criminals as they begin to carry out what they believe is a real crime.  *Id.* at 298 n.1.

Although the court upheld the conviction, it was troubled by two aspects of the fictional sting operation and how it came about in the first place.  First, the court of appeals was concerned that the defendants were convicted of conspiracy to possess cocaine with intent to distribute and use of firearms in furtherance of a drug trafficking crime which resulted from an operation created and staged by ATF.  *Id.* at 302-303.  An ATF undercover officer used a CI and invented the entire scenario, the need for weapons and a "crew," and the amount of cocaine involved.  The court found that the facts of the case suggested that the defendants were responding to the government's script, and that their only overt actions involved showing up at meetings, arriving at a parking lot with four hidden, loaded weapons, and driving to the storage warehouse where they were arrested.  The defendants' actions corroborated that they intended to carry out these robberies, but also that they were responding to the scheme created by the government.

The *Black* court's second concern with the reverse sting operation was how the government recruited the defendants.  ATF did not infiltrate a suspected crew of home invasion robbers or seduce persons known to have actually engaged in these types of crimes.  Rather, the evidentiary hearing established that ATF used the CI to find individuals willing to commit a home invasion.  The CI testified he carried out his mission by going to bars in "bad" areas where persons engaged in criminal activity were likely to gather.  On one visit to a bar he approached a man to see if he would be interested in doing a home invasion robbery.  The man said that he was not interested, but somebody he knew would be.  The man introduced the CI to one of the

defendants.  The CI told the defendant that he had a friend who had information about a house, possibly with some dope in it, and asked whether the defendant would be interested in putting a crew together to rob the house.  The defendant agreed and the CI set up a meeting with the undercover ATF agent.

In a subsequent meeting with the defendant, CI and undercover agent, the undercover agent gave a cover story that he was a cocaine courier who transported drugs for a group of Mexican dealers and wasn't happy with the pay he was receiving.  The undercover agent stated he wanted to rob the Mexican drug dealers, described the modus operandi, told the defendant that at the beginning or end of each month he would receive a call informing him the drugs were ready for transportation at a particular house, and that he would only have fifteen minutes to pick up the drugs or the dealers would move to a new location.  The undercover agent stated he would enter the house, see two individuals, at least one of two would be armed, and that one of the individuals would go to a back room to obtain six or seven kilograms of cocaine, give the drugs to the undercover, and tell him where to take the drugs.  The undercover agent told the defendant that each time he did this, he could see anywhere from twenty-two to thirty-nine kilograms of cocaine in the living room and did not know what might be in the back room which contained more cocaine.

The undercover emphasized that he wanted to make sure that people the defendants involved in the proposed robbery had "the balls to go do it because this ain't no easy lick."  At an evidentiary hearing, the undercover officer testified he chose details that demonstrated a particularly high potential for danger and violence to insure that only individuals who "are truly involved in this type of crime" would agree to it, and those who are not would back out.  The defendant told the undercover he had "goons" willing to commit robbery and murder and asked the undercover on numerous occasions how many "goons we're gonna need."  Each time  the undercover stated he didn't know and that was the defendant's call.

The defendant bragged about the criminal history and acumen of his "goons" to commit crimes of this nature and subsequently introduced his co-defendants to the CI and undercover agent in a meeting ten days later.  The undercover agent repeated his cover story about being a

disgruntled drug courier, and plans to rob a fictitious stash house.  Black proposed several scenarios about how to rob the stash house, mentioned the possibility of taking an occupant to the back room as a hostage, and told the undercover that he "got this shit down to a science man."

The initial target told the undercover that he and Black needed guns for the robbery, but did not have any.  The undercover officer stated he didn't have any either, and that if he did, he would do the robbery himself.  Black eventually said that getting guns would be no problem.  The undercover officer questioned Black and the individual who recruited him about their intention to do the robbery without other crew members telling them that the men in the stash house were not going to just give the drugs to them.  Black and the individual who recruited him insisted that having a small crew would be better for taking a stash house by surprise, but eventually said they would probably bring in one or more crew members.  At the subsequent meeting, additional crew members were introduced to the undercover.

At a third meeting the following day with the undercover, the additional crew members were introduced.  The undercover repeated his cover story and asked one of the new defendant crew members how he wanted to do the robbery and the defendant responded, "You tell me, dude.  I mean, this is your gig.  I mean, I don't know about this shit."

At a meeting set with the undercover agent for the following day, the group did not show up at the time scheduled.   The undercover officer testified he felt he was being surveilled.  Twenty-five minutes after the scheduled meeting, the defendants pulled up in two vehicles with another individual who was introduced as a driver.  The undercover told the crew he had rented a warehouse unit nearby where they should deliver his portion of the cocaine from the stash house and asked them to follow him there.  When the group arrived at the warehouse they were arrested.  A search of the vehicles uncovered four loaded weapons in a hidden compartment.

The individual who initially introduced the defendants to the undercover agent cooperated with the government and testified against his co-defendants at trial.  The defendants were convicted and appealed arguing the government's conduct in the case was so outrageous that it violated the due process clause of the Fifth Amendment.  Although the Ninth Circuit was

1    troubled by aspects of the government's investigation and tactics, it ultimately upheld the

2    convictions holding that the government's reverse sting operation did not amount to outrageous

3    government conduct.

4          In upholding the convictions the Ninth Circuit applied various factors its prior cases had

5    found relevant to determine whether the government conduct was outrageous: (1) known

6    criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the

7    government's role in creating the crime of conviction; (4) the government's encouragement of

8    the defendants to commit the offense conduct; (5) the nature of the government's participation in

9    the offense conduct; and (6) the nature of the crime being pursued and the necessity for the

10    actions taken in light of the nature of the criminal enterprise at issue.  *See* 733 F.3d at 303.

11    However, the Ninth Circuit stated that these factors were not a "formulistic checklist," but a

12    means to focus the court's "analysis of the totality of the circumstances."  *Id*. at 304.

13          The Ninth Circuit reviews a district court's decision to grant or deny a motion to dismiss

14    an indictment for outrageous government conduct *de novo*.  *Black* at 301.  In conducting its *de*

15    *novo* review, the Ninth Circuit views the evidence in the light most favorable to the government,

16    and accepts the district court's factual findings unless they are clearly erroneous.  *Id*.

17          Applying these factors, the court finds that under the totality of the circumstances

18    presented here, the government's conduct is not so outrageous that due process principles require

19    dismissal of the indictment.  For the reasons discussed below, the court finds that this is not such

20    an extreme case requiring dismissal because the government engaged in conduct which violated

21    fundamental fairness and is so shocking and so outrageous as to violate the universal sense of

22    justice.

23          **1.**      **Individualized Suspicion & Known Criminal Characteristics.**

24          It is undisputed that the initial investigation that led to this undercover reverse sting

25    operation stems from an investigation of White for selling firearms and stolen firearms to an

26    ATF CI, and on the last two occasions, to the CI and Larios.  White has not moved to dismiss the

27    indictment for outrageous government conduct.  There is no question that the government had

28    / / /

1   individualized suspicion about White's criminal activities and was aware of White's criminal

2   record before the reverse sting was initiated.

3        The government alleges, and Knapp does not dispute, that on January 6, 2014, the CI told

4   ATF agents that he had had a conversation with White on January 2, 2014, in which White and a

5   second individual, who had multiple felony convictions for robbery, second degree murder, and

6   trafficking a controlled substance had participated in an armed home invasion of a local

7   methamphetamine dealer.  During the January 2, 2014 meeting with the CI, White stated that the

8   victim of the home invasion robbery revealed where his proceeds were hidden after the

9   perpetrators threatened to shoot his dog.  At the January 2, 2014 meeting, the CI stated that

10   White had a large amount of money that he said was his share of the home invasion robbery of

11   the methamphetamine dealer.  White also stated that the second individual at the meeting

12   participated in the home invasion and claimed he had youngsters he called "rah rahs" available to

13   handle any "business" the CI might have.

14        The CI reported this January 2, 2014 contact with White and the unidentified individual

15   to his ATF handler on January 6, 2014.  On January 10, 2014, the CI and Larios conducted a

16   controlled buy of stolen firearms from White.  After the transaction was completed, ATF agents

17   learned that a stolen handgun White sold belonged to a victim of a 2008 homicide in Phoenix,

18   Arizona.  At a subsequent meeting on January 28, 2014, the CI and Larios in his undercover

19   capacity made another controlled purchase of a handgun and a 12 gauge shotgun from White.

20   The transcript of the recorded meeting confirms that Larios told White he had some "heavy

21   lifting" for White who responded he was in the "construction business."  Larios stated he needed

22   the "NFL" not "junior varsity" to which White responded "my dudes are Hall of Fame."  This

23   was the meeting that resulted in the ATF's initiation of the reverse sting operation for which

24   Knapp and his co-Defendants were indicted in this case.

25        By this time, White had sold a number of firearms, including stolen firearms to the CI.

26   White also sold handguns to the CI and Larios at the January 10 and 28, 2014 meetings.  After

27   the January 10th meeting, ATF investigation revealed that one of the firearms which White sold

28   had belonged to a victim of a 2008 homicide in Phoenix, Arizona.  This was also after the CI

1    reported to ATF that White and another unidentified individual had claimed that they had

2    participated in a home invasion robbery of a stash house, provided details about the robbery, and

3    White had flashed a wad of cash he said was his share.

4         At the January 28, 2014 meeting with White, the CI, and Larios, the undercover agent

5    "set the bait" about some "heavy lifting" and suggested a home invasion robbery of a stash

6    house.  White responded he was in the "construction business" and had "dudes" in the "Hall of

7    Fame" willing to help him.  It is undisputed that the government did not have individualized

8    suspicion or know of the criminal history of Knapp or Williams until White brought them to the

9    February 25, 2014 meeting with the CI and Larios.  However, it was White, not ATF or its CI,

10   who recruited Knapp and Williams.  At the time White recruited his co-Defendants, White had

11   committed a number of crimes, ATF had ample individualized suspicion that White was willing

12   to commit home invasion robberies of a stash house, and was aware of White's criminal history.

13        The government does not need individualized suspicion of a defendant's wrongdoing

14   before conducting an undercover investigation, but it is "an important consideration."  *Black* at

15   304 (citing *United States v. Luttrell*, 923 F.2d 764, (9th Cir. 1991) (en banc)).  This factor is

16   closely related to whether a defendant had a criminal background or propensity the government

17   knew about when it initiated its sting operation.  *Id*.  Here, Knapp argues that the government

18   had no information about him at all until after White brought Knapp to the February 25, 2014,

19   meeting.  The government concedes that it had no knowledge of Knapp's criminal history until

20   after White brought him to the February 25, 2014 meeting.  ATF was aware that White had

21   committed multiple felonies in selling firearms and stolen firearms, was a convicted felon, had

22   reported that he had recently conducted a stash house home invasion robbery, and had a crew

23   willing to participate in home invasion robberies.  The court finds that although the AFT lacked

24   individualized suspicion in Knapp or Williams, their appearance and statements at the February

25   25, 2014 meeting created individualized suspicion.

26        Additionally, in *Black*, the Ninth Circuit found that although the government's lack of

27   individualized suspicion or knowledge of defendants' criminal characteristics weighed in favor

28   of the defendants, their repeated representations that they had engaged in related criminal activity

in the past "quickly supplied reasons to suspect they were likely to get involved in stash house robberies." *Id.* at 307. Here, although the government had no information about Knapp or Williams until the February 25, 2014 meeting, both stated in recorded conversations that they had done home invasion robberies in the past, and that Knapp, Williams and White had already begun planning how to do the stash house robbery Larios proposed before they met with Larios that day.

The Ninth Circuit found that as long as the investigation was "initiated and performed tolerably as a whole, it would undermine law enforcement's ability to investigate and apprehend criminals if its otherwise acceptable conduct became outrageous merely because an individual with no known criminal history . . . joined the criminal enterprise at the behest of codefendants." *Id.* at 308 n.11. The government has now produced the transcripts of the recorded undercover meetings, and Knapp does not dispute their authenticity, genuineness, or accuracy. The transcripts show that Knapp was an eager participant in planning the fictional stash house robbery and once the government set the bait, he expressed a willingness to participate, and had experience in this type of crime.

After Knapp and Williams were identified at the February 25, 2014 meeting, ATF conducted criminal records checks. The criminal records checks reflected that both Defendants had convictions for violent felonies.

### 2.    ATF's Role in Creating the Crime.

In evaluating whether the government engaged in outrageous conduct under the due process clause of the Fifth Amendment, the court should also consider whether the government initially approached the defendant, or whether the defendant approached the government agent. *Id.* Additionally, whether the government proposed a criminal enterprise or merely attached itself to one that was already established and ongoing is a relevant factor. *Id.* Like the stash house robbery scheme in *Black*, the stash house robbery scheme in this case was entirely the government's creation. In this case, it is undisputed that the ATF did not initiate its reverse sting investigation until after White told the CI that he and another individual had recently committed a home invasion robbery and that White was interested in putting together a crew to do future

home invasion robberies.  Knapp does not dispute that the CI reported to ATF that White claimed he had individuals willing to commit home invasion robberies and murder if necessary.

This is not a case of the government's CI trawling bars in impoverished minority neighborhoods to see if he could get individuals interested in doing home invasion robberies for untold riches to take the bait.  The undercover sting operation was only initiated after White told the CI who reported to his ATF handlers that White had recently claimed to have committed home invasion robberies and was interested in putting a crew together to do future home invasion robberies.  Before the ATF initiated its reverse sting operation, White had made a number of controlled buys of firearms and stolen firearms to the CI, and one to the CI with the ATF undercover officer present.  It was only after White had engaged in multiple felony transactions, including selling a stolen firearm belonging to a victim of a 2008 Arizona homicide that a meeting was arranged with White, the CI, and Larios.  It was during this meeting that the undercover asked if White was interested in a "heavy lifting" home invasion-type robbery of a stash house.  The transcript of the recorded meeting reflects that White enthusiastically embraced the proposal, and boasted that he had a trusted experienced crew also willing to participate.

The recorded conversations indicate that all three Defendants were enthusiastic, willing participants who boasted about their prior escapades, including their acumen and prior experience home invasion-type robberies who were willing to plan and participate in the crimes for which they were eventually indicted.

### 3.  ATF's Encouragement of Defendants.

The extent to which the government encouraged a defendant to participate in the charged conduct is important, and "mere encouragement" is less likely to qualify as "outrageous conduct" than pressure or coercion.  *See Black,* 733 F.3d at 308.  Knapp contends the government did more than merely encourage him to commit the crime when the undercover agents asked Knapp whether he was "down for it," inquiring whether Knapp had "tools" for the job, stating they needed to find the "right guys" to do the job, agreeing to split the proceeds down the middle, telling Knapp the home invasion was a "try out," and if all went well, Knapp would be kept on "retainer."  However, the court's review of the transcripts does establish that the ATF engaged in

outrageous government conduct which threatened or coerced Knapp to engage in a fictional stash house home invasion robbery. The government certainly set the bait by proposing the stash house robbery and making it enticing by the quantity of drugs that were claimed there, and the lax security of the two Mexican dudes, one of whom was armed who would admit a trusted courier. However, the Defendants were told Larios had never seen any cash in the drug house. The transcripts show that the Defendants were not cajoled, pressured, harassed or coerced into going along. In fact, they were told more than once that they could back out if they wanted. They all bit on the plan when it was proposed, professed a willingness to do whatever was necessary, said they had the tools, would use zip ties to take the occupants hostage, and would shoot Larios in the body or stomach to make sure that Larios was not suspected of participation in the robbery. The transcripts reflect that the Defendants were eager and willing participants who eagerly jumped at the opportunity.

### 4.      ATF's Participation in the Crime.

In considering the government's participation in offense conduct, the Ninth Circuit has instructed that the court should look at the duration, nature, and necessity of the government's participation. *Id.* Participation for a longer time is of greater concern than intermittent or short-term involvement. *Id.* (citing *Greene,* 454 F.2d at 786) (finding outrageous government conduct where government's participation was of "extremely long duration," lasting about three years). In examining the nature of the government's participation, the court looks at whether the government acted as a partner in the criminal activity or an observer of a defendant's criminal conduct, and the court also considers any "particularly offensive conduct" by the government during the course of the sting. *Id.* Lastly, in determining the necessity of the government's participation in the criminal enterprise, the court looks at whether a defendant would have had the technical expertise or resources necessary to commit the crime without the government's participation. *Id.* at 309.

Here, the reverse sting operation was not initiated until after White told the CI that he had recently conducted a home invasion robbery, displayed cash he reported came from the robbery, and stated he wanted to put together a crew to perform future home invasion robberies. The

entire reverse sting consisted of four meetings between February 12, 2014, and March 5, 2014, when all of the Defendants were arrested.  Only White, the CI, and Larios were present at the February 12, 2014 meeting to discuss the "heavy lifting" home invasion robbery of a stash house.  There were only two subsequent meetings on February 25, 2014, and March 2, 2014, before the final meeting which resulted in the Defendants' arrest on March 5, 2014.  It is undisputed that the entire proposed home invasion robbery of a stash house occurred over a three-week period.  The ATF investigation of Knapp lasted a mere eight days between February 25, 2014, and March 5, 2014.

The ATF participated in the offense conduct by providing the basic scenario for the stash house robbery, but left it to the Defendants to decide how to execute it.  The transcripts of the recorded meetings contain repeated statements by Carr that he didn't want to tell them how to do their business, although Carr asked about their plan, whether they were prepared, and had the "tools" for the job.  Carr and Larios also asked the Defendants how they planned on getting rid of the drugs indicating they had people if the Defendants did not.  However, the Defendants said they had a way to get rid of the drugs and explained their plans to sell the drugs in Texas to avoid word getting out on the street about the stash house robbery.  Carr did offer to get the Defendants a rental car they could use as a getaway vehicle so they would not have to drive one of their own vehicles.  However, the rental car was not going to be provided until the day of the robbery. ATF also provided the warehouse serving as the staging area for the final meeting preceding the fictitious stash house robbery.  Nothing in the record indicates whether the rental car was actually brought to the warehouse facility.  The transcript of the March 5, 2014 final meeting and arrest does not indicate the car was discussed.  Knapp concedes the government did not provide hard-to-obtain materials to commit the robbery.  The Defendants did not ask ATF to provide weapons or other "tools."

It was White and Knapp who determined that they would "zip tie" everyone up and give Larios a "couple body shots" to insure that he was not suspected of participating in the robbery. All three Defendants discussed their plan to gain entry to the stash house.  Their initial plan was to have Larios leave the door unlocked after he was admitted and the Defendants would rush in

as Larios was leaving.  However, after discussing it among themselves before the next meeting with the CI and Larios, the Defendants decided it would be better to immediately "get the drop on" the men answering the door to "get up close and personal" and take immediate control of the situation as Larios entered the stash house.  White, Knapp and Williams were intimately involved in planning the stash house robbery, and neither Larios or Carr offered direction about how to do the robbery.  These facts weigh against finding outrageous government conduct.

### 1. Nature of the Crime Being Investigated.

Finally, the Ninth Circuit instructs lower courts to consider the need for the investigative technique used in light of the challenges of investigating and prosecuting the type of crime charged.  *Id.* at 309.  The *Black* court recognized that "stash house robberies are largely unreported crimes that pose a great risk of violence in residential communities."  *Id.*  In addition, reverse sting operations were designed to avoid risks inherent to a real stash house robbery because the situation is controlled and unfolds just enough to capture people willing to commit such a crime without taking the final step of an actual home invasion.  *Id.*  These risks, however, do not give the government license to forego other techniques to identify and target suspects.  *Id.* at 309-310.  Additionally, courts must be "vigilant" that the government only "sets the bait" and does not "create criminal convictions by outrageous means."  *Id.* at 310.

Law enforcement conduct becomes unconstitutional when the government directs the criminal enterprise from *start to finish*.  *Id.* (emphasis in original).  Generating new crimes simply for the sake of pressing criminal charges is outrageous government conduct, "at least where the government essentially manufactured the crime."  *Id.*  (citing *Emmert*, 892 F.2d at 812-13).  The Ninth Circuit has observed that "it is difficult to discern the point of division at the margins between police conduct that is just acceptable and that which goes a fraction too far."  *Id.* (citing *Bogart*, 783 F.2d at 1438).

The facts in this case are far less egregious than the facts the Ninth Circuit questioned, but nevertheless upheld in *Black* which involved a very similar ATF-initiated fictitious stash house robbery.  This case does not involve a random,  dragnet of poor neighborhoods looking for otherwise law-abiding young men living in poverty given an opportunity to commit a robbery

with untold riches that would lift them out of their impoverished state.  The reverse sting was only initiated after White bragged that he had recently committed a home invasion robbery of a methamphetamine dealer, discussed the details, flashed a wad of cash he said was his share of the proceeds, and stated he wanted to put together a crew to do future stash house robberies.  When Knapp and Williams were introduced at the February 25, 2014 meeting, they both claimed that they had experience committing home invasion-type robberies and were eager to participate in the fictional crime that was described.

*Black*  was a 2-to-1 decision.  Judge Noonan authored a strong dissent critical of the reverse sting operation of an imaginary stash house that takes no real drugs off the streets.  He found the fictional crime orchestrated by the ATF designed to tempt and trap criminals "conduct disgraceful to the federal government."  *Black*, 733 F.3d at 318.  Judge Reinhardt authored a similarly strong dissent denying Black's petition for rehearing *en banc*.  *United States v. Black, 750* F.3d 1053 (9th Cir. 2014).  Even more recently, Judge Wright recently dismissed an indictment arising out of an ATF reverse sting operation remarkably close to the factual pattern in this case.  *United States v. Hudson*, 3 F.Supp. 3d 772 (C.D. Cal. March 10, 2014).  However, the majority opinion in *Black* is controlling and requires an analysis of the totality of the circumstances on a case-by-case basis.  For the reasons stated, the court concludes that the totality of the circumstances presented here do not meet the extremely high standard set by the Ninth Circuit for dismissal of an indictment for outrageous government conduct.

### C.    Dismissal Pursuant to the Court's Supervisory Powers.

The court may exercise its supervisory powers to dismiss an indictment where: (1) the government violated a defendant's recognized right; (2) engaged in illegal conduct that must be deterred; or (3) where there is evidence that a jury's verdict rested upon in appropriate considerations.  *Id*. at 310 n.12 (citing *United States v. Ramirez*, 710 F.2d 535, 541 (9th Cir. 1983).  The supervisory power provides authority for the courts to supervise their own affairs, not the affairs of the other branches of government.  *See United States v. Sampson*, 927 F.2d 1088, 1091 (9th Cir.1991).  "Judicial integrity is rarely threatened significantly when executive action does not violate the Constitution, a federal statute, or a procedural rule."  *United States v.*

1   *Gatto*, 763 F.2d 1040, 1046 (9th Cir. 1985).  Knapp has not established that the government

2   violated a recognized Constitutional or statutory right, engaged in any illegal conduct that must

3   be deterred, and as this case is in the pretrial stages, the third factor does not apply.

4   **III.**    **Conclusion**.

5        The facts of this case are far less egregious than the law enforcement conduct the Ninth

6   Circuit found troubling, but still upheld in *Black*.  ATF did not use a CI to trawl bars  in bad

7   areas of town looking for impoverished individuals to tempt them to commit a crime that would

8   net unimaginable immediate wealth.  White was already under ATF's radar as a convicted felon

9   who was selling multiple firearms, some of them stolen, to an ATF CI and undercover officer in

10   a series of controlled buys that were  monitored and recorded.  It was only after White claimed to

11   have committed a recent armed home invasion of a local methamphetamine dealer and was

12   looking to put a crew together to do more home invasion robberies that ATF lodged its reverse

13   sting operation which netted White and his co-Defendants who eagerly jumped on the

14   opportunity provided.

15        For the reasons stated,

16        **IT IS RECOMMENDED** that Knapp's Motion to Dismiss (Dkt. #34) be **DENIED**.

17        Dated this 7th day of November, 2014.

18

19                         Peggy A. Leen

20                         United States Magistrate Judge

21

22

23

24

25

26

27

28